## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| MEDICAL IMAGING, INC. | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE |
| | ) | |
| v. | ) | NO. _____ |
| | ) | |
| CHANGE HEALTHCARE | ) | |
| TECHNOLOGY ENABLED | ) | |
| SERVICES, LLC, | ) | |
| CHANGE HEALTHCARE, INC., | ) | |
| OPTUM, INC., UNITEDHEALTH | ) | |
| GROUP INC. | ) | |
| | ) | |
| Defendants. | | |

## **COMPLAINT**

Plaintiff Medical Imaging, Inc. ("Medical Imaging"), by and through undersigned counsel, brings this Complaint for damages against Defendants Change Healthcare Technology Enabled Services, LLC ("CHT")[1], Change Healthcare, Inc. ("Change Healthcare") (Change Healthcare, together with CHT, "Change"), Optum, Inc. ("Optum"), and UnitedHealth Group Inc. ("UHG") (Change, together with UHG and Optum, "Defendants") and alleges the following:

---

[1] Medical Imaging contracted with PST Services, LLC on June 7, 2017. Change Healthcare later acquired PST Services, LLC and amended the name of the company to Change Healthcare Technology Enabled Services, LLC. *See* **Exhibit 1 ("Ex. 1")**, Certificate of Amendment Name Change (January 3, 2018).

## PRELIMINARY STATEMENT

1.      Medical Imaging provides radiology and nuclear medicine services in Honolulu, Hawaii.

2.      Defendant Change is a part of Optum, which in turn is part of UHG. Optum completed its merger with the software and data analytics firm, Change, in 2021.

3.      Defendant Change manages healthcare technology pipelines, including operation of an electronic data clearinghouse through which healthcare providers and insurers communicate regarding healthcare services claims (the "Platform").

4.      Through the Platform, Change processes millions of transactions per year for healthcare providers like Medical Imaging. More specifically, healthcare providers submit patient and healthcare service details to Change, Change processes the information, prepares claims, and submits the claims to health insurance companies for payment. Subsequently, providers, like Medical Imaging, receive reimbursement payments from the insurance companies.

5.      On June 2, 2017, Medical Imaging and Change executed the Master Services Agreement ("MSA") pursuant to which Change was required to provide claims management and processing, insurance verification, authorization and

medical necessity reviews, and medical billing and collection services to Medical Imaging (the "Services").

6.      In February 2024, Change's Platform was breached by hackers during a ransomware attack and data breach (the "Breach").

7.      To contain the Breach, Change took its Platform offline and ceased processing healthcare transactions, including those Change was obligated under the MSA to process, bill, and collect on behalf of Medical Imaging. Further, while the Platform was offline, Medical Imaging was unable to verify patient insurance coverage, determine copays, submit claims, or receive payments.

8.      Change failed to implement any contingency plan to continue providing Services to Medical Imaging after they were interrupted by the Breach.

9.      Medical Imaging's business operations have been harmed by Change's negligence in failing to secure and safeguard their information systems from a foreseeable cyberattack and failing to have an adequate contingency plan in place to mitigate the interruption of its claims processing, billing and collection services as the result of such a data breach.

10.     Over the course of many months, including as late as September 2025, Change repeatedly misrepresented to Medical Imaging when it would resume execution of the Services it was obligated to provide under the MSA on behalf of

Medical Imaging. In fact, it has become clear that Change had ceased performing the Services entirely or materially, resulting in the expiration of insurer's timely filing requirements and permanently preventing Medical Imaging from billing and collecting for rendered clinical services, which consequently impaired Medical Imaging's ability to continue operating.

11.    Further frustrating Medical Imaging's ability to bill and collect its accounts receivable, Change has failed to provide Medical Imaging's outstanding claims data in a format that enables Medical Imaging to directly bill and collect such accounts receivable.

12.    Change failed to submit bills to health insurers on behalf of Medical Imaging resulting in more than $500,000 in accounts receivable that Medical Imaging has been unable to collect and increasingly appears that it will not collect.

## **PARTIES**

13.    Medical Imaging is a Hawaii corporation with its principal place of business in Honolulu, Hawaii.

14.    PST Services, LLC ("PST") was a Georgia limited liability company with its principal place of business in Alpharetta, Georgia.

15.    PST was acquired by Change Healthcare, Inc. in December 2017, and later amended its name to be "Change Healthcare Technology Enabled Services,

LLC." Change Healthcare Technology Enabled Services, LLC's member corporation Change Healthcare Holdco, Inc., is incorporated in the state of Delaware, and its principal place of business is in Tennessee. It is therefore a citizen of Delaware and Tennessee.

16.      Defendant Change Healthcare, Inc. is a Delaware corporation with its principal place of business in Nashville, Tennessee. It is therefore a citizen of Delaware and Tennessee.

17.      Defendant Optum, Inc. is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota. It is therefore a citizen of Delaware and Minnesota.

18.      Defendant UnitedHealth Group ("UHG") is a Delaware corporation with its principal place of business in Minnetonka, Minnesota. It is therefore a citizen of Delaware and Minesota. UHG oversees the management of Change's cybersecurity systems.

## JURISDICTION AND VENUE

19.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

20.      This Court has personal jurisdiction over Change because Change

consented to personal jurisdiction in Georgia in the MSA.[2]

21.     This Court has personal jurisdiction over UHG and Optum because they do business in Georgia and Medical Imaging's claims arise out of and relate to their provision of services and activities in Georgia.

22.     Optum has repeatedly corresponded with Medical Imaging regarding its, Change's, and their affiliated entities performance under and relating to the MSA, a contract under which they consented to personal jurisdiction in Georgia and which is governed by Georgia law.

23.     UHG, Optum, and Change are all involved in the breach of the MSA, a contract governed by Georgia law.

24.     Venue is appropriate in this district because Change and Medical Imaging consented to venue in this district in the MSA.[3]

## FACTUAL ALLEGATIONS

25.     Change is a healthcare services and support company that provides revenue and payment cycle management to healthcare providers. Through its Platform, Change connects health insurers, providers, and patients within the US

---

[2] **Exhibit 2 ("Ex. 2")**, MSA, §4.10 ("Each party agrees that the exclusive venue for all actions, relating in any manner for this MA will be in a federal or state court of competent jurisdiction located in Fulton County, GA").
[3] *Id.*

healthcare system.

26.      Change specializes in "moving patient data from doctor's office to doctor's office, or to and from your insurance company."[4] This patient data includes highly sensitive individual information, including Social Security numbers, health data, medical records, insurance information, and more.

27.      Given the volume and highly sensitive nature of the data that Change processes, stores, and transmits for Covered Entities (as such term is defined at 45 CFR § 160.103), Change functioned as a Business Associate (also defined at 45 CFR § 160.103) and was directly subject to compliance obligations under the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, as amended by the HITECH Act (as defined below), and the related regulations promulgated by HHS (as defined below) (collectively, "HIPAA"). Change was required to and did enter into a Business Associate Agreement ("BAA") with Medical Imaging and contractually agreed to certain obligations with respect to the protection of information received, created, stored and transmitted by Change on behalf of Medical Imaging. Among other obligations, the BAA states that:

---

[4] Ron Wyden, Wyden Hearing Statement on Change Healthcare Cyberattack and UnitedHealth    Group's    Response    (May    1,    2024), https://www.finance.senate.gov/imo/media/doc/0501_wyden_statement.pdf    (last visited January 16, 2026).

"[Change] will use appropriate administrative, physical, and technical safeguards to comply with the Security Rule with respect to Electronic PHI, to prevent use or disclosure of such information other than as provided for by the Underlying Agreement and this Agreement."[5]

28.     Change's contractual commitments to data security demonstrate that it was fully aware of its responsibility to protect patients' Protected Health Information ("PHI"), and Individually Identifiable Health Information ("IIHI") (as such terms are defined in 45 CFR § 160.103), and other Personally Identifiable Information ("PII") (as such term is defined in the context of the Privacy Act of 1974 at 5 U.S.C. § 522a).

29.     Change also committed to Medical Imaging to provide "24 hours access" to the Change medical billing Platform with limited exceptions. After the Breach, Change failed to provide "24-hour access" and did not provide repairs to the system to get operations, including the Services back online.

30.     Change did not provide Medical Imaging with back up support or services or implement a contingency plan to enable Medical Imaging to continue to process outstanding medical payments and reimbursements.

31.     Change understood that failure to protect PHI, IHII, PII, or Change's

---

[5] **Ex. 2**, MSA, Ex. A, Business Associate Agreement, § 3.1 (June 2, 2017).

systems could lead not only to a security breach but also to a catastrophic system outage. Change further understood that such an outage would prevent it from processing medical payments, which in turn would cause significant financial harm to providers like Medical Imaging who rely on its services.

**The Data Breach**

32.     On February 21, 2024, UHG reported in its required 8-K SEC filing that "a suspected nation-state associated cyber security threat actor had gained access to some of the Change Healthcare information technology systems."[6]

33.     Following the Breach, Change disconnected its Platform, which had the effect of halting payments to providers during the outage, including Medical Imaging.[7]

34.     After Change disconnected its Platform, Medical Imaging sent several requests to Change inquiring about when Change would resume billing. As a result of Change's operational interruptions, almost nothing could be billed nor collected for Medical Imaging. Nonetheless Change continued to represent to

---

[6] UnitedHealth Group Inc., Current Report (Form 8-K) (Feb. 21, 2024).

[7] Testimony of Andrew Witty, Chief Executive Officer, United Health Group, House Energy and Commerce Committee, Subcommittee on Oversight and Investigations (May 1, 2024) https://d1dth6e84htgma.cloudfront.net/Witty_Testimony_OI_Hearing_05_01_24_5ff52a2d11.pdf (last visited January 16, 2026).

Medical Imaging that these issues were either non-existent or were actively being addressed. These representations from Change continued throughout 2025.

35.     Despite Change's representations, it has become apparent that Change, contrary to its express representations, has not been collecting accounts receivables for Medical Imaging. As a result, Medical Imaging's outstanding accounts receivable balance exceeds $500,000.

**The Data Breach and Resulting Shutdown were Foreseeable Risks of Which Defendants Were on Notice and Which Defendants Could Have Prevented.**

36.     As early as 2014, the U.S. Federal Bureau of Investigation ("FBI") warned healthcare stakeholders that they were the target of hackers, stating "[t]he FBI has observed malicious actors targeting healthcare related systems perhaps for the purpose of obtaining Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[8]

37.     On October 28, 2020, the FBI and two federal agencies released a "Joint Cybersecurity Advisory" warning that they had "credible information of an increased and imminent cybercrime threat to U.S. hospitals and healthcare

---

[8] *See* FBI Cyber Bulletin: Malicious Actors Targeting Protected Health Information, PUBLIC INTELLIGENCE (Sept. 2, 2014), https://publicintelligence.net/fbi-targeting-healthcare/ (last visited January 16, 2026).

providers."[9] The Advisory, issued by the Cybersecurity and Infrastructure Security Agency ("CISA"), the Department of Health and Human Services ("HHS"), and the FBI, urged healthcare providers to promptly implement "timely and reasonable precautions" to safeguard their networks against these threats.[10] The Advisory specifically identified multi-factor authentication as a best practice for network security to mitigate the likelihood of cybercrime threats.[11]

38.     In 2023, the FBI reported 249 ransomware attacks in the healthcare industry.[12]

39.     According to HHS, Office for Civil Rights, the healthcare sector has experienced a 278% increase in large breaches involving ransomware which led to "extended care disruptions, patient diversions to other facilities, and delayed medical procedures, all putting patient safety at risk."[13]

---

[9] Ransomware Activity Targeting the Healthcare and Public Health Sector, CYBERSECURITY & INFRASTRUCTURE SEC. AGENCY (Nov. 2, 2020), https://www.cisa.gov/news-events/cybersecurity-advisories/aa20-302a (last visited January 16, 2026).
[10] Id.
[11] Id.
[12] FBI, 2023 Internet Crime Report (2023), https://www.ic3.gov/AnnualReport/Reports/2023_ic3report.pdf (last visited January 16, 2026)
[13] HHS Press Office, HHS Announces Next Steps in Ongoing Work to Enhance Cybersecurity for Health Care and Public Health Sectors, U.S. DEPT. HEALTH & HUM. SERVS. (Dec. 6, 2023), https://www.hhs.gov/about/news/2023/12/06/hhs-

40.      Defendants were aware of and should have adhered to healthcare industry standards for the safeguarding of data as outlined by federal agencies like the FBI, HHS, and CISA.

41.      Defendants have dealt with previous data breaches recently. In May 2023, United HealthCare, a UHG subsidiary, notified members that PHI may have been compromised due to a credential stuffing attack that occurred on the United Healthcare mobile app in February 2023.[14]

42.      Accordingly, Defendants knew, particularly given the vast amount of PHI, IIHI, and PII that Providers like Medical Imaging acquire, transmit, and store to and with Defendants directly or through vendors, they were a target for cybercriminals. Accordingly, Defendants should have taken all reasonable measures to avoid and mitigate cyberattacks.

43.      Defendants also understood the risks posed by their insecure data security practices and computer networks. Defendants' failure to heed warnings and failure to adequately secure their computer networks resulted in complete disruption

---

announces-next-steps-ongoing-work-enhance-cybersecurity-health-care-public-health-sectors.html (last visited January 16, 2026).

[14] Steve Alder, Credential Stuffing Attack Exposed United HealthCare Member Data, HIPAA Journal (May 2, 2023), https://www.hipaajournal.com/credential-stuffing-attack-exposed-united-healthcare-member-data/ (list visited January 16, 2026).

of the Services and disabling of the Platform.

44.     The disabling of the Platform prevented Medical Imaging from billing and collecting payments, eviscerating its income and causing severe financial strain that threatened its ability to operate and provide essential medical care to patients.

45.     Despite their crucial position in the healthcare sector, Defendants neglected to adhere to the recommended best practices outlined by CISA including implementation of multi-factor authentication. Had Defendants implemented basic security measures, the hackers would have been unable to access millions of patient files, potentially preventing the Breach entirely or significantly limiting its scope. Additionally, Change failed to implement essential safeguards to prevent and detect phishing attacks and failed to establish sufficient monitoring or control systems to identify unauthorized infiltrations post-Breach.

46.     Defendants' negligence, failure to adhere to industry standards and regulatory requirements is unjustifiable, particularly considering their awareness of being a prime target for cyberattacks.

47.     Specifically, in Congressional testimony, the Chief Executive Officer of UHG, Andrew Witty, testified that "criminals used compromised credentials to remotely access a Change Healthcare Citrix portal, an application used

to enable remote access to desktops. The portal **did not have multi-factor authentication**."[15]

48.    Defendants knew that a breach of their computer systems, and exposure of the highly sensitive information processed and stored therein, would very likely necessitate taking their systems offline to address the resulting issues, thereby depriving healthcare providers of critical services. Accordingly, Defendants had a duty to implement a backup system that would fulfill the basic functions for the Plaintiff in the event of a cybersecurity incident such as the February 2024 Breach.

49.    However Defendants failed to maintain a backup system and had to take their systems offline, which resulted in enormous damage to Medical Imaging, including the inability to collect at least $500,000 of outstanding accounts receivable causing significant financial strain and threatening Medical Imaging's ability to continue operation.

---

[15] Testimony of Andrew Witty, Chief Executive Officer, United Health Group, House Energy and Commerce Committee, Subcommittee on Oversight and Investigations          (May          1,          2024) https://d1dth6e84htgma.cloudfront.net/Witty_Testimony_OI_Hearing_05_01_24_5ff52a2d11.pdf (emphasis added) (last visited January 16, 2026).

**Defendants Failed to Comply with Federal Law and Regulatory Guidance**

50.     By obtaining, collecting, using, and deriving a benefit from PHI, IIHI, and PII, Defendants assumed the duty (both legally and contractually) of protecting such information from unauthorized disclosure. In addition to their common law duties, Defendants' duty to use reasonable security measures arose, in part, under HIPAA, and its state law counterparts, as well as federal and state consumer protection laws. In the MSA, Change acknowledged that it functions as a HIPAA Business Associate for a HIPAA Covered Entity – Medical Imaging – and agreed to comply with certain HIPAA regulations as part of its provision of Services.[16]

51.     As a Business Associate under HIPAA, Change agreed to comply with HIPAA rules, including the Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E (which establish standards for the privacy of individually identifiable health information), and the Security Rule (which specifies security standards for the protection of electronic protected health information), 45 C.F.R. Part 160 and Part 164, Subparts A and C.[17] HIPAA requires, *inter alia*, that Change reasonably protect PHI from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to

[16] **Ex. 2**, MSA, Ex. A, Business Associate Agreement, §3.1.
[17] **Ex. 2**, MSA, Ex. A, Business Associate Agreement, §1.

- 15 -

protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

52.     HIPAA restricts the permissible uses of PHI and prohibits unauthorized disclosures of PHI. *See* 45 C.F.R. § 164.502.

53.     HIPAA mandates that Change implement suitable safeguards for PHI. 45 C.F.R. § 164.530(c)(1).

54.     HIPAA also mandates that Change notify individuals in the event of a breach of unsecured PHI which includes PHI that has not been rendered unusable, unreadable, or indecipherable to unauthorized individuals, such as non-encrypted data. 45 C.F.R. § 164.404; 45 C.F.R. § 164.402.

55.     Despite these obligations, Defendants failed to fulfill their duties under HIPAA. Specifically, *inter alia*, Change failed to: (1) ensure the maintenance of a sufficient data security system to mitigate the risk of data breaches and cyberattacks; (2) enact technical policies and procedures for electronic information systems that handle electronic PHI; (3) implement adequate policies and procedures to prevent, detect, contain, and correct security violations; and (4) adequately protect the confidentiality and integrity of electronically stored or transmitted PHI.

56.     Moreover, businesses entrusted with sensitive data are furnished with authoritative and readily accessible resources aimed at mitigating the risks of cyberattacks. For instance, the Federal Trade Commission ("FTC") has released

several guides underscoring the significance for businesses of employing reasonable data security practices, which should inform all decision-making processes related to business operations.[18]

57.     Among other recommendations, the FTC guidelines advise that businesses should safeguard the personal customer information they collect and store, properly dispose of personal information that is no longer needed, encrypt information stored on their computer networks, understand vulnerabilities within their networks, and implement policies to address security issues. Additionally, the FTC guidelines suggest that businesses utilize an intrusion detection system, monitor incoming traffic for any unusual activity, watch for large volumes of data being transmitted from their system, and have a response plan prepared in the event of a breach.[19]

58.     Additionally, the FTC recommends that businesses restrict access to sensitive data, mandate the use of complex passwords for network access, employ industry-tested security methods, monitor networks for any suspicious activity, and ensure that third-party service providers have implemented reasonable security

---

[18]     Start     with     Security,     FTC, https://www.ftc.gov/system/files/documents/plainlanguage/pdf0205-startwithsecurity.pdf (last visited January 16, 2026).
[19] *Id.*

measures.[20]  This  FTC Guidance is consistent with that provided by the FBI, HHS

and is consistent with the principles set forth in the CISA 2020 guidance, all of which

are readily accessible to Defendants.

59.     Businesses that neglect to adequately protect customer information

have faced FTC enforcement actions. The FTC regards the failure to implement

reasonable and appropriate measures to safeguard against unauthorized access to

confidential consumer data as an unfair act or practice, which is prohibited by

Section 5 of the Federal Trade Commission Act. 15 U.S.C. § 45. Orders resulting

from these actions provide additional clarity on the steps businesses must take to

fulfill their data security obligations.[21]

60.     Despite being fully cognizant of its obligation to protect patients'

PHI, Change neglected to adhere to fundamental recommendations and guidelines

that could have averted this Breach. Moreover, despite awareness of prior

cyberattacks, Change failed to take adequate preventative measures. Change's

failure to implement reasonable cybersecurity measures to prevent unauthorized

access to patient information constitutes an unfair act or practice, which is proscribed

---

[20] FTC, *supra* note 17.

[21] Privacy and Security Enforcement, FTC, https://www.ftc.gov/newsevents/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited January 16, 2026).

by the FTC Act ("FTCA"). *See* 15 U.S.C. § 45.

61.     As a result of Change's failure to implement reasonable cybersecurity measures, Medical Imaging could not collect outstanding payments resulting in significant damage to Medical Imaging.

## Allegations Relating to Medical Imaging

62.     Medical Imaging provides nuclear radiology services in Honolulu, Hawaii.

63.     Medical Imaging contracted with a third-party company, PST Services, LLC, now owned by Change Healthcare, to provide medical billing and reimbursement Services.

64.     Change disconnected its systems due to the Breach, effectively stopping its provision of Services to Medical Imaging.

65.     Once the Breach occurred and Change disabled its Platform, Medical Imaging was unable to process coverage verifications, bill and collect for services rendered, and manage its outstanding accounts receivable.

66.     The disruption of processing, billing, and collecting of Medical Imaging's reimbursements is the result of Change's failure to implement appropriate safeguards, failure to adequately mitigate the Breach, and failure to provide sufficient contingency support to its customers including, without limitation, its

decision to disconnect its Platform after the Breach.

67.    After Change disconnected its Platform and failed to provide adequate contingency support or interim operations, Medical Imaging made numerous attempts to resolve the operational interruption and detrimental impact on Medical Imaging's ability to process, bill and collect for its healthcare services including through calls, emails, and demand letters sent to Defendants.

68.    As recently as September 2025, Change continued to represent that it had resolved issues and resumed billing and collections and would continue to collect outstanding accounts receivable, but it has provided no evidence of such efforts and, Medical Imaging continues to suffer from over $500,000 in uncollected or uncollectable accounts receivable resulting from Change's failure to provide the Services, reflecting that Change in fact had not meaningfully resumed performance under the MSA.

69.    Along the way, Change attempted to terminate the MSA without basis, engaging in a series of reversals through which it varyingly suggested it had no duties to Medical Imaging and/or that it had resumed and would continue complying with performing its obligations under the MSA. Upon information and belief, these actions were intended to and actually had the effect of obfuscating Change's substantial and continuing failures to perform under the MSA.

70.     Change could reasonably foresee that it might have to disconnect its network in the event of a data breach given its failure to protect its network from cyberattacks in accordance with industry standards, federal agency recommendations, legal and regulatory requirements, contractual requirements, and its own industry knowledge.

71.     Medical Imaging's business operations suffered substantial harm because of Change's negligence, discontinuation of Services, and disabling of its Platform.

72.     Due to Medical Imaging's inability to submit bills and collect for services rendered to its customers after the Change Platform was disabled, Medical Imaging experienced a profound backlog of outstanding accounts receivable and insufficient data with which to independently bill and collect for its services, causing Medical Imaging to suffer enormous damage and, threatening its ability to continue to provide valuable medical treatment to its patient population.

73.     The longer amounts remain unbilled and/or uncollected the less likely Medical Imaging will ever be able to collect for the services rendered from patients and health insurers

74.     Currently, Medical Imaging estimates losses in excess of $500,000 based on outstanding medical bills that were not processed due to the Change outage.

This massive outstanding accounts receivable balance fundamentally threatens Medical Imaging's ability to continue servicing clients.

75.    Upon information and belief, Change did not implement and did not have a backup plan in the event of a data breach.

76.    Change was obligated to have such a plan given the clear threat of a data breach and the foreseeability of a breach given Change's lax cybersecurity coupled with its legal and contractual obligations to clients like Medical Imaging.

77.    Because Change lacked a meaningful contingency and backup plan in the event of a data breach, its Platform was not timely reconnected following the Breach. As a result, clients, including Medical Imaging, continue to suffer damages by Change's failure to provide contractual services, comply with industry standards, meet legal and regulatory requirements, and follow federal recommendations and guidelines.

78.    Aggravating the harm to Medical Imaging, when Medical Imaging requested that Change release data to Medical Imaging regarding uncollected amounts so that Medical Imaging could assess the possibility of using a third-party for collections, Change refused Medical Imaging access to previous billing records and did not provide any personnel to assist with access to such records.

79.    Moreover, throughout its provision of services, Change made

significant numbers of billing errors including submitting duplicate bills to insurers and patients, for which refunds had to be issued, and assigning the wrong provider number.

## COUNT I
## NEGLIGENCE

80.     Medical Imaging repeats and realleges all preceding paragraphs, as if fully alleged herein.

81.     Defendants received patients' PHI, IIHI and PII from Medical Imaging to enable patients to access healthcare services and to perform Defendants' Services under the MSA in connection with patients receiving and paying for medical treatment. Defendants processed and stored PHI, IIHI and PII to provide health services as well as for commercial gain.

82.     Defendants owed Medical Imaging a duty to exercise reasonable care in protecting patients' PHI, IIHI and PII from unauthorized disclosure or access.

83.     Defendants owed a duty of care to Medical Imaging to provide adequate data security, consistent with industry standards, to ensure that Change's systems and networks adequately protected the PHI, IIHI and PII and ensured that Medical Imaging would retain access to necessary PHI, IIHI and PII and data in the event of any type of cybersecurity incident.

84.    Defendants also owed a duty of care to Medical Imaging to ensure timely billing and collection of Medical Imaging's receivables to preserve their collectability and ensure Medical Imaging's ability to continue to operate.

85.    Defendants' duty to use reasonable care in protecting PHI, IIHI and PII arises from common law, state law and federal law, including HIPAA and the FTCA described above and Change's own policies and promises regarding privacy and data security.

86.    Defendants knew, or should have known, of the risks inherent in collecting and storing PHI, IIHI, and PII in a centralized location, Change's vulnerability to network attacks, and the importance of adequate security.

87.    It was foreseeable that Medical Imaging would be harmed as a result of Change's inadequate cybersecurity practices and its consequences.

88.    Defendants breached their duty to Medical Imaging in numerous ways, as described herein, including by:

- Failing to exercise reasonable care and implement adequate security systems, protocols, and practices;

- Failing to adequately invest in security technology and resources necessary to support Change's vast network and Platform;

- Failing to comply with industry standard data security measures for the

healthcare industry leading up to the Breach;

- Failing to comply with its own privacy policies;

- Failing to comply with applicable laws and regulations protecting the PHI, IIHI and PII received, processed and stored by Change and at issue in the Breach; and

- Failing to adequately monitor, evaluate, and ensure the security of Change's network and systems.

89.    Change would not have disconnected the Platform and interrupted the Services but for its wrongful and negligent breach of its duties to Medical Imaging.

90.    Given that healthcare providers and affiliates are prime targets for hackers, Defendants' failure to take proper security measures to protect patients' PHI, as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act. It was also foreseeable that as a result of a data breach, Change would have to disconnect systems that could disrupt the operations and healthcare practices of Medical Imaging.

91.    It was further foreseeable that Change would require a contingency plan in the event of a data breach to ensure the continued provision of services to clients like Medical Imaging.

92.     As a direct and proximate result of Defendants' conduct, Medical Imaging has suffered damages, including the inability to collect outstanding payments and out-of-pocket expenses associated with (i) transitioning its practice to Queen's University Medical Group to allow for the provision of substitute administrative services including billing services; (ii) notifying patients of the Breach; (iii) late penalties assessed for untimely payment of expenses; and (iv) reimbursements issued to insurers and patients due to Defendants' billing errors.

93.     Furthermore, Medical Imaging's damages include time and effort spent researching and switching to the employ of Queen's University Medical Group for the provision of administrative services, including billing services.

## COUNT II
## NEGLIGENCE PER SE

94.     Medical Imaging repeats and realleges all preceding paragraphs, as if fully alleged herein.

95.      At all relevant times, Defendants had an obligation to comply with applicable statutes and regulations, including, without limitation Section 5 of the FTCA , 15 U.S.C. § 45(a)(1) and HIPAA.

96.     Defendants acknowledged their obligation by entering into the MSA and the BAA with Medical Imaging requiring compliance with all applicable laws

and regulations.[22]

97.      Section 5 of the FTC prohibits "unfair . . . practices in or affecting commerce." The FTC has interpreted Section 5 to include as an unfair act or practice the failure by a business to employ reasonable security measures to secure access to their paid for systems, despite representing otherwise.

98.      HIPAA requires, *inter alia*, that Defendants maintain adequate data security systems to reduce the risk of data breaches and cyberattacks, adequately protect the PHI of patients, and ensure the confidentiality and integrity of electronically created, received, maintained, or transmitted PHI. *See, e.g.*, 45 C.F.R. § 164.

99.      By failing to use reasonable security measures to secure access to their billing services, despite representing otherwise, including by not complying with applicable industry standards such as implementing multi-factor authentication. Defendants' duty to use reasonable care in protecting PHI arises from common law and federal law, including HIPAA and the BAA, the latter in which Change made affirmative promises regarding its privacy and data security measures and practices.

100.      Defendants' violation of Section 5 of the FTCA and HIPAA constitutes negligence per se.

---

[22] **Ex. 2**, MSA, Ex. A, Business Associate Agreement, § 3.1 (June 2, 2017).

101.    Medical Imaging is within the class of persons that Section 5 of the FTCA and HIPAA are intended to protect.

102.    The harm suffered by Medical Imaging as a result of the Breach is the type of harm that Section 5 of the FTCA and HIPAA are intended to guard against.

103.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in securing their network, Platform, and other systems would result in harm to Medical Imaging due to not being able to timely process coverage verifications or bill and collect for its services rendered to patients.

104.    The injury and harm that Medical Imaging suffered was the direct and proximate result of Defendants' violation of Section 5 of FTCA and HIPAA. Medical Imaging has been injured, and its damages include, without limitation, uncollected outstanding payments.

## COUNT III
## NEGLIGENT OMISSION

105.    Medical Imaging repeats and realleges all preceding paragraphs, as if fully alleged herein.

106.    Medical Imaging brings this claim as to Defendants' statements and omissions before and during the MSA, and Defendants' statements after the Breach and resulting disconnection of its network, Platform, and other systems necessary to

provide the Services.

107.    Defendants failed to disclose (a) material weaknesses in the Defendants' systems, (b) the lack of a contingency or backup procedure system in the event of a security incident or data breach, and (c) the true timeline for when Services would resume following the Breach

108.    Such omissions were material (a) when Medical Imaging contracted with the Defendants for the Services based on the Defendants' representations that the Services were secure and complied with federal regulations; and/or (b) following the Breach when Medical Imaging attempted to mitigate the harm imposed by Defendants' disconnection of its network and Platform.

109.    Medical Imaging would not have contracted with Defendants for the medical billing Services had it known that they were not as secure as represented by Defendants in the MSA and BAA, and/or that Defendants failed to comply with federal and state laws and regulations and federal and industry standards and guidelines.

110.    Medical Imaging would have taken different measures to mitigate the harm had Defendants provided truthful and accurate information about the duration of the intentional shutdown of the Platform.

111.    As a direct and proximate result of Defendants' wrongful conduct,

Medical Imaging has suffered damages including uncollected outstanding payments.

## COUNT IV
## NEGLIGENT MISREPRESENTATION

112.    Medical Imaging repeats and realleges all preceding paragraphs, as if fully alleged herein.

113.    Medical Imaging brings this claim as to Defendants' statements and omissions before and during the MSA, and Defendants' statements after the Breach and shutdown of the Platform.

114.    As alleged in greater detail above, Defendants made numerous representations: (a) regarding the supposed secure nature of the Services; and (b) following the Breach, regarding the impact of the Breach on the Platform and the Services as well as the timeline for when the Platform would be back online and the Services resumed. Such representations were false because Defendants (a) lacked adequate data privacy and security practices, which rendered their Services unsecure and led to the Breach; and (b) had exclusive knowledge of facts that clearly indicated that it would be months before the Platform was up and running at its previous capacity causing Medical Imaging to have months of uncollected payments.

115.    Such representations were material to Medical Imaging who reasonably relied on the Defendants' representations.

- 30 -

116.     Medical Imaging would not have contracted with Defendants for the Services had it known that they were not as secure as represented, and that Defendants failed to comply with state and federal laws and regulations and federal and industry standards and guidelines.

117.     Medical Imaging would have taken different measures to mitigate the harm had Defendants provided truthful and accurate information about the duration of the intentional shutdown of the Platform and disruption of the Services.

118.     Defendants intended for Medical Imaging to rely on their representations both before and after the Breach. In reliance on Defendants' representations, Medical Imaging executed the MSA with Change pursuant to which Medical Imaging engaged Change to provide the Services based on Change's false representations that the Services were secure. Following the Breach, Medical Imaging relied on Defendants' representations when making crucial decisions to mitigate the harm imposed by Defendants' shutdown of the medical billing Platform and discontinuation of the Services.

119.     Defendants' failed to exercise due or reasonable care in making the representations and assuring themselves of their veracity.

120.     As a direct and proximate result of the Defendants' wrongful conduct, Medical Imaging has suffered damages including uncollected outstanding

payments.

## COUNT V
## GROSS NEGLIGENCE

121.    Medical Imaging repeats and realleges all preceding paragraphs, as if fully alleged herein.

122.    Defendants received patients' PHI, IIHI, and PII to enable patients to access healthcare services and to perform Services in connection with Defendants' clients' patients receiving medical treatment. Defendants stored PHI, IIHI and PII to provide healthcare services as well as for commercial gain.

123.    Defendants owed Medical Imaging a duty to exercise diligence in protecting PHI, IIHI and PII from unauthorized disclosure or access. Defendants did not exercise even slight diligence in performing their duties, failing to exercise care they promised to take in protecting PHI, IIHI and PII pursuant to the MSA and the BAA. Change promised to implement appropriate safeguards to protect such information from use or disclosure other than those uses provided for in the MSA.[23]

124.    Defendants owed a duty of care to Medical Imaging to provide adequate data security, consistent with applicable laws, regulations and industry standards, to ensure that Change's systems, networks and Platform adequately

---

[23] MSA, Ex. A, Business Associate Agreement, §3.1.

protected the PHI, IIHI and PII and ensure that Medical Imaging would retain access to such information and data in the event of any type of cybersecurity incident or data breach.

125.    Patients entrusted Medical Imaging with their PHI, IIHI and PII and Medical Imaging shared that information with the Defendants so that Medical Imaging could accurately verify coverage and bill and collect for medical services it provides to patients. As a result of this relationship, Defendants owed a duty of care to Medical Imaging to provide adequate data security, consistent with applicable laws and regulations and industry standards, to ensure that Change's systems and networks adequately protected the PHI, IIHI and PII and to ensure that Medical Imaging would retain access to such information and data in the event of any type of cybersecurity incident or data breach.

126.    Defendants' duty to exercise diligence in protecting PHI, IIHI and PII arises from the MSA, the BAA, common law, and state and federal laws and regulations, including the FTCA and HIPAA, as agreed to by Defendants in the MSA.

127.    Defendants knew, or should have known, of the risks inherent in collecting and storing PHI, IIHI and PII in a centralized location, Change's vulnerability to network attacks, and the importance of adequate security.

128.    It was foreseeable that Medical Imaging would be harmed as a result of any inadequate cybersecurity practices and its consequences.

129.    Defendants consciously failed to exercise even slight diligence to protect PHI, IIHI, and PII. The specific gross negligence acts and omission committed by Defendants included, but are not limited to the following:

- Failing to exercise reasonable care and to implement adequate security systems, protocols, and practices;

- Failing to comply with industry standard data security measures for the healthcare industry leading up to the Breach;

- Failing to comply with Defendants' own privacy policies;

- Failing to comply with laws and regulations protecting the PHI, IIHI and PII at issue in the Breach; and

- Failing to adequately monitor, evaluate, and ensure the security of Change's network, Platform and other systems.

130.    Change would not have disconnected the Change Platform but for its wrongful and grossly negligent breach of its duties.

131.    Medical Imaging would not continue to suffer damages had Change implemented a contingency plan rather than grossly ignoring its duty to Medical Imaging to continue providing Services.

132.    Given that healthcare providers and affiliates are prime targets for hackers, Defendants' failure to take proper security measures to protect PHI, IIHI and PII, as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act. It was also foreseeable that as a result of a data breach, Change would have to disconnect systems that could disrupt healthcare practices of Medical Imaging.

133.    As a direct and proximate result of Defendants' conduct, Medical Imaging has suffered damages, including uncollected outstanding payments

### COUNT VI
### BREACH OF CONTRACT

134.    Medical Imaging restates and re-alleges every allegation of the preceding paragraphs of this Complaint.

135.    Acting in the ordinary course of business, Change contracted with Medical Imaging to offer its Services including its Platform whereby Change submitted insurance claims to insurance companies for evaluation and payment.[24]

136.    In performing these contractual duties, Change agreed to an obligation to reasonably safeguard its network, Platform and other systems and data from cyberattack, including ransomware attacks, which can cause an interruption in

---

[24] **Ex. 2**, MSA, Service Schedule 1, § 2.2.1 (June 2, 2017).

the flow of an enterprise's routine and everyday services to its clients.[25]

137.    In February 2024, following the Breach, Change disconnected the Change Platform, preventing Medical Imaging from accessing and using the Platform, thereby breaching contractual obligations to Medical Imaging.

138.    Change represented as late as September 2025 that its Services were back online and that Change was working to collect outstanding payments; however Medical Imaging has received no evidence of such actions and the accounts receivable remain outstanding.

139.    As a direct and proximate result of Defendants' contractual breaches, Medical Imaging sustained actual losses and damages including, but not limited to, complete interruption and disruption of its ability to collect outstanding accounts receivable.

## COUNT VII
## UNJUST ENRICHMENT

140.    Medical Imaging restates and re-alleges every allegation of the preceding paragraphs of this Complaint.

141.    Medical Imaging conferred benefits on the Defendants in the form of payment for the Services, both directly and indirectly. Defendants had knowledge

---

[25] **Ex. 2**, MSA, Ex. A, Business Associate Agreement, § 3.1 (June 2, 2017).

of the benefits conferred by Medical Imaging and appreciated such benefits. Defendants should have used, in part, the monies Medical Imaging paid to them, directly and indirectly, to pay the costs of reasonable data and network privacy and security safeguards and procedures.

142.    Defendants state that they devote "significant resources" to protect PHI, IIHI and PII a portion of which is derived from the benefit conferred by the contractual payments made by Medical Imaging to Defendant.

143.    Medical Imaging has suffered actual damages and harm as a result of the Defendants' conduct, inactions, and omissions. Defendants should be required to disgorge for the benefit of Medical Imaging all unlawful or inequitable proceeds received from Medical Imaging.

## COUNT VIII
## VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT

144.    Medical Imaging repeats and realleges every allegation of the preceding paragraphs of this Complaint.

145.    Under the Georgia Fair Business Practice Act ("GFBPA"), it is unlawful for any person to, in the conduct of consumer transactions and consumer acts or practices in trade or commerce, use unfair or deceptive acts or practices. Ga. Code Ann. §10-1-393(a).

146.    Medical Imaging is considered a "person" for the purpose of the

GFBPA. Ga. Code Ann. §10-1-392(a)(24).

147.      Defendants engaged in unfair acts or practices, including but not limited to the following:

- Defendants violated Section 5 of the FTCA , which prohibits "unfair or deceptive acts or practices in or affecting commerce," including as interpreted by the FTC, the unfair act or practice by a business, such as Defendants, of failing to employ reasonable security measures to ensure access to their paid-for Change Platform, despite representing otherwise.

- Defendants also violated HIPAA by failing to use reasonable security measures to ensure access to their paid-for Change Platform, despite representing otherwise, by not complying with applicable industry standards.

148.    Defendants engaged in deceptive practices by representing that its security services were of a particular quality or standard including through the following:

- Prior to the shutdown, Defendants knowingly and willingly misrepresented, through statements and omissions, that their network maintained adequate protections and maintained data in

a HIPAA-compliant manner to induce Medical Imaging to use and rely on the Defendants' services. Medical Imaging's decision to trust the Defendants with their processing needs was based on the Defendants' statements that they would take adequate security precautions and maintain industry standard cybersecurity measures, and omissions that the Defendants maintained weak data security that failed to comply with the law.

• During the shutdown, Defendants knowingly and willingly misrepresented, through statements and omissions, the extent and impact of the shutdown. Defendants did so with the intent to deceive Medical Imaging into believing that the Change Platform would return to functionality quickly so that Medical Imaging would continue to use the Change Platform.

149.    Defendants failed to establish reasonable security measures including, for example, multi-factor authentication. Defendants further failed to establish any back up system in case of a security incident or data beach. As a result, Medical Imaging was unable to continue to collect bills.

150.    Medical Imaging has suffered actual damages as a result of Defendants' actions.

151.    As a direct and proximate result of Defendants' wrongful conduct, including Defendants' shutdown of their Platform and failure to bring their Platform back online, Medical Imaging has suffered damages including one or more of the following: missed payments for their healthcare services and delayed payments for their healthcare services. Consequently, over $500,000 in uncollected accounts receivable remain outstanding.

152.    Moreover, as a direct and proximate result of Defendants' misleading statements and omissions during the shutdown, Medical Imaging has incurred additional financial damages, the extent of which is not yet fully known and continues to impact Medical Imaging.

153.    Medical Imaging's damages were proximately caused by Defendants' actions.

154.    But for Defendants' failure to employ reasonable security measures, in violation of the law, and despite representing otherwise, the Change Platform would not have been shut down, Medical Imaging would not have suffered injuries and incurred damages.

155.    At all relevant times, Defendants were willfully and knowingly engaged in the use of an unfair and deceptive practice declared to be unlawful.

## **PRAYER FOR RELIEF**

WHEREFORE, Medical Imaging respectfully requests that the Court provide the following relief:

(a)     Award Medical Imaging compensatory, consequential, and general damages including nominal damages as appropriate for each count as allowed by law in an amount to be determined at trial;

(b)     Award statutory damages, trebled, and/or punitive or exemplary damages, to the extent permitted by law;

(b)     Award the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

(c)     Award pre-and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury of all issues triable as a matter of right.

This 16th day of January, 2026.

**HOLLAND & KNIGHT LLP**

*/s/ Patrick B. Reagin*
Patrick B. Reagin, Esq.
Georgia Bar No. 502117
MacKenzie Gansert
Georgia Bar No. 824281
Brandon L. Lewis
Georgia Bar No. 436099
Regions Plaza, Suite 1800
1180 West Peachtree Street
Atlanta, Georgia  30309
Telephone:  (404) 817-8500
Facsimile:  (404) 881-0470
E-Mail:  patrick.reagin@hklaw.com

*Attorneys for Medical Imaging, Inc.*

## **<u>LR 7.1(D) FONT COMPLIANCE CERTIFICATION</u>**

The undersigned counsel for Medical Imaging, Inc. hereby certifies that the within and foregoing document was prepared using Times New Roman 14-point font in accordance with Local Rule 5.1 of the United States District Court for the Northern District of Georgia.

This 16th day of January, 2026.

**HOLLAND & KNIGHT LLP**

*/s/ Patrick B. Reagin*
Patrick B. Reagin, Esq.
Georgia Bar No. 502117

*Attorney for Medical Imaging, Inc.*